May it please the court, your honor, Van Arvanites on behalf of Wesley David Edwards, who is a member of the Blackfeet Indian Reservation in Browning, Montana. I'm from the Great Falls Office of the Federal Defenders of Montana and it's a pleasure to be here. The main issue in this case concerns the cross-reference of the guideline. Cross-reference, the court initially started at guideline 2A, 2.4 obstruction in impeding officers and cross-referenced under subsection C to aggravated assault. It is our argument that 2.4 is the correct guideline because there was no aggravated assault. Help me out. What would that do to the sentence? Under the guideline range, my client's record being 1, no scorable criminal history, it trebled the sentence essentially from 15 to 21 months to 51 to 63 months. At the jail, Mr. Judge Hedges, known as Hang'em High, Hang'em High Haddon. We had a judge who sat with us very recently known as Hang'em High Henry. But to his credit. Do you hang people in Montana? I think that law was abolished. So how can you hang'em high? Well, he gets the high end quite a bit. Well, we had it in Washington very recently. That was the last state to have hanging. And we found it was perfectly fine on the 6 to 5 vote. On the 6 to 5 vote. You've got to change your name. Well, it's not my name. But anyway, we are familiar with the judges in Montana. But in this case, Judge Haddon even found that this was an unusual case. And for him, he gave a very low sentence of 54 months, which is toward the low end of the guideline. So I think even he was troubled by the situation that he was. So there has to be some cross-reference, doesn't there? You mean from? Yes. Because there has to be some analogous guideline. Yes, exactly. And under 2X5.1, because this was charged under a Montana statute, criminal endangerment, the starting point should be 2.4. And even the probation officer didn't start at 2.4. So even Judge Haddon realized that 2.4 was the correct starting point, not 2.2. There are enhancements that would perfectly define this offense within 2.4. The official victim, of course, is taken into consideration. So we don't have a 6-level enhancement for that. A bodily injury is taken into consideration. Reckless endangerment is even taken into consideration. And the application note in the guideline for that criminal reckless endangerment even creates a scenario very similar to Mr. Edwards, whose only offense was speeding. As I see it, the real issue here is the ambiguity of whether Note 2 and the general doctrine about double counting in this situation requires us to apply the rule of lenity. Is that a fair summary? I would say yes. I would say that the substantial risk of bodily injury that's incorporated in criminal endangerment is already incorporated. Is there another issue about whether it was correct to apply permanent or life-threatening bodily injury as opposed to serious bodily injury? There is. There is. I'm glad the court brought that up. The court really didn't analyze the substantial impairment part of permanent bodily injury. How do we do that? One of the learned law clerks, I think, calculated that it was 2% or 3% permanent injury in this case as opposed to, I think, 25% in the case on the closest case that found permanent bodily injury. Yes. What credence should we give that? How much should that play into our thinking? I stressed it at sentencing, and it was a main part of my sentencing memorandum. It was actually even less. It was aggregate 3%. It was 1% permanent injury of the neck, 2% in the shoulder, and he went back to work in a few weeks. It sounded like a working comp report. Well, I will leave that to the court, but yes, that's certainly because the initial diagnosis in paragraph 14 of the PSR, the day after the accident, was he's going to be fine. There should be no rateable injury in this, and yet we have 2% or 3%, and all of a sudden from that, we have serious and permanent bodily injury. Without that, I would argue we wouldn't even be here. In this case, instead of a wash, it's lavash. It's lavash. Correct. Correct. So, if the court doesn't have any further questions, I would ... Thank you. ... have the rest of my time. Thank you very much. May it please the court. Bishop Grewell on behalf of the United States. Judge Haddon started with the guideline that they suggest should apply, the obstructing officer guideline, but that guideline then says if you've got an aggravated assault resulting in serious bodily injury, you should refer to that ... You cross-reference then to the aggravated assault guideline. Here, they did ... There was clearly an assault under this court's decision in Laura, L-O-E-R-A-923-F-2nd-725, where you have reckless driving that causes serious bodily injury. That is sufficient for an aggravated assault resulting in serious bodily injury. So it's appropriate to move over to this particular cross-reference. At that point, the questions before us are whether we have the permanent bodily injury and whether the official victim enhancement should apply. They did not dispute that ... First, they did not dispute the 3% permanent impairment. Secondly, they did not dispute that the doctors found that there was a ... How much of a physical impairment does the law require before the permanent injury factor has to be taken into account? I think it's a factual matter in each case, Your Honor. Here, I think it's met by the degenerative condition is back and the fact that two years later, he still said he had recurrent pain and he couldn't completely move his head and neck. If, again, arguendo, if we apply the official, the officer enhancement because that really bumps it up to show who was involved in the nature of the situation, as Judge Reinhardt indicated, in effect, the rest of this is more like a workers' comp situation. I suspect he got workers' comp for that and probably ... I don't know. Is the record to indicate one way or another on that? On whether he received workers' comp? I believe he is receiving it. I'm not sure that's in the record, though. I know it's not key, but I guess the point is that it is a really unfortunate situation, but I'm just interested. When does this thing get triggered? The only case that I could find that got down fairly low was 25% permanent disability. Was it 20, did you say? I thought it was 25, but whatever it was. It was a long way from 3%. What triggers it for purposes of a sentencing? I don't think it's a percentage matter based on a workers' comp thing. I think in each case, it's a factual matter, and here, it just simply is an abuse of discretion on the judge's part to find that if the guy's ... Unless he's improperly applied the law, in which case it's not an abuse of discretion situation. I think that's what we're really wrestling with here is did Judge Haddon, who frankly seemed to be wrestling with this, at least looking at the colloquy, didn't know for sure whether he could do that. He did apply both of them, but we're looking at this as a matter of law, whether you apply the two when there's some ambiguity in note two and this general concept that you don't double count thing. My concern is when you have, admittedly, an injury, and I'm not trying to make light of it, but I'm just simply saying at what point does the permanent injury factor enter in? If it's 3%, I mean, if it were a brain injury, that's one thing, and maybe that's the fact specific thing you're talking about. With what he has, when you already have the officer enhancement, do we really trigger that or does the rule of lenity apply? I don't think the officer enhancement is specifically taking into account the amount of injury that Well, I agree with that. I'm just talking about with the permanent injury factor. Sure, and I think that there's no case law suggesting that it's not a substantial impairment if you can't, two years later, you still are suffering from recurring pain, you can't move your neck, that that's not a substantial impairment. So the government's position would be if it were, I don't know how you quantify this, but say one-tenth of 1% permanent injury, I think he couldn't turn the last part of his smallest finger. Would that trigger it? I don't think that that would probably trigger it. If you want to talk about percentage turns. What about four fingers? If he couldn't move his four fingers? Oh, if it's impaired, he can't move it, with the same facility as he did before the accident. I think it very well could reach it at that point, depending on, I mean, if he can't type and that's an important part of his job, then I think that's a significant impairment. Is that how we measure this? I don't quite understand what condition the policeman was in after this accident. Was he still working? He could still work, he just, he couldn't move his neck completely around and he was still suffering from pain. And over time, over time he had this, the doctor said he had this degenerative condition in his back that was going to grow worse because of the accident. So he could become quite incapacitated as time goes on. He had the condition before? It suggests that he had it, but this made it substantially worse, it exacerbated it. What would the sentence have been if this had been the endowment of the police officer? So you would end up taking out the official victim enhancement, so that would have dropped six, that would have dropped out six levels. I believe everything else would have been the same at that point. What would the enhancement have been for the two of them? Would that have been an aggravated assault on the civilian? It still would have been an aggravated assault here. Would you chase him to his own pleasure? I guess in the case of a civilian, they'd have to be making a citizen's arrest, which you can do in Montana, but yes. You can hang people and? You can make citizen's arrests. So the question would be, you might have a causation question at that point, so why was the civilian chasing him? So I guess there would be that concern based on the question. That's what I'm saying. It probably wouldn't have been an offense at all if it weren't an official victim. It's less likely, yes. So maybe there shouldn't be an official victim, because maybe that's double-counting. I don't think that's true, because it doesn't necessarily require there to be an official victim. Have you ever heard of a case where someone had an aggravated assault because a citizen was chasing him because he was speeding? Well, his reckless driving here, say we had another person coming in the other lane, right? And his driving at night, turning off his lights, turning them on and off, speeding at that speed, he causes somebody to swerve. We could have gone after an aggravated assault for that and it still would have occurred here. No, but if he had a crash because he was speeding. Right. Yes, that would have been an aggravated assault. But for driving down the highway where someone chases him, that probably wouldn't have been an aggravated assault at all, and there wouldn't have been any crime, except that it was a police officer. Right, based on that factual situation. But that doesn't necessarily mean there's double-counting here, because there are factual situations in the same situation where he's driving as he was that would cause an aggravated assault to occur without an official victim. Not this kind of situation, not chasing him. The reason you've got the crime at all is because the police officer was chasing him. Sure, but I think the double-counting concerns are where a particular guideline is trying to get, ends up getting at the same thing, because that's sort of the intent of the guideline, as opposed to the facts just happen to meet both situations. I mean, we have factual situations in every case, a factual situation that's going to meet more than one guideline. If you didn't have those facts, you wouldn't meet both of those guidelines. What's the situation here where, at least as I understand it, the police officer had basically broken off the chase? He was, in effect, texting. He was noting stuff on his official screen. Did I misunderstand that? The uncontested facts in the PSR suggest that he was calling dispatch, saying he was going to break off the chase. He hit the count just before he started to slow down. So he was planning on slowing down, but he hadn't started to slow down. Okay, and was he texting? I don't want to be heavy. You know I've talked about the little kind of cords. Right. Mine is saying he was contacting the dispatch. I don't know if he was doing that on his microphone. I don't know that there's anything in the record suggesting whether that was a phone call or texting. Let's say he was. Say he was texting, and he was violating the law, aside from the hanging offense that it might be. Would that play any role in our analysis of whether there is double-counting here and whether one or the other is inapplicable? I think at that point, if defense counsel had sort of established some facts that there was an intervening circumstance and that he was breaking the law, that might be something that would break off the causation, but that burden would be on them to establish some sort of intervening circumstance. So based on the record we have here, there's nothing of that nature that we should consider. That's correct. Okay. I guess the other issue that's in the case in the last minute, unless there are other questions, is the clear and convincing. We just think because the facts here were undisputed that assuming the court believes those facts meet the applications, it would have been the same thing under the clear and convincing standard. So he simply can't show any prejudice here with regard to those different enhancements and the use of the cross-reference. Unless there are further questions, I'll cede the remainder of my time. Thank you. Just a few comments, Your Honors. It's very significant that the government charged this not agassault of an LEO, which they could have, and certainly they would have had a real tough road. Law enforcement officer. Law enforcement officer, sorry. It's also a lion, but they don't hang those. They don't hang those. You know, and they would have had a tough climb trying to show intent, trying to show certainly, I think, serious bodily injury. And they charge it as criminal endangerment, which takes into account the substantial risk of bodily injury, which is already taken into account in the guideline. And that's what the rule of lenity that Justice Smith was talking about. So we, you know, we have the same set of facts, whether it's 2.4, obstruction in impeding an officer, and agassault 2.2. We have the same set of facts. And yet, based upon the 3% threshold, which, again, 1% being the neck, 2% the shoulders. That's it. He was, if you read the, he was, and I did make a big deal about this at sentencing. I mean, he was more worried about his fishing trip in Alaska later on in the week or two weeks from then. He was worried about weightlifting to keep his weight down because he's a big weightlifter. He had already a degenerative condition on his back. So just based upon that 2% or 3%, we're stuck with the same set of facts, moving over to agassault and adding all this time. Let me ask you this because I'm, I find all this kind of puzzling. If the serious bodily injury, if the police officer had lost a leg as a result of this, would it have been the same enhancement? If the police officer lost a leg, it would. Clearly, that would be a serious bodily injury. Sure. And that would have been a serious bodily injury. I think that the cross-reference probably would apply in that respect. So you're making, you're asking us to distinguish this case because of the lack of severity of permanent injuries or the quantum of those as opposed to the cross-reference itself, which is a little different than what we started off with. Well, but I go back to, yes, I think that… Let me interrupt you for a second. Sure. What Judge Schroeder just indicated to you is if you've got a severed leg, would this apply? And you said probably. It would be serious bodily. Serious bodily. So now we don't have that. We have something less. But you're not saying anymore, look, you've got double counting here because there's ambiguity. You apply the rule of lenity. You're saying this wasn't that serious an injury and, therefore, we ought not to apply. Which is it? But I think, well, I think they would have charged it as ag assault of an LEO then, clearly. But, you see, because they would have easily been able to prove serious bodily injury, they would have been able to prove all the elements for, I mean, the charge itself, I think, would have been completely different than simply criminal endangerment, which is… Okay. But what's the test that we're supposed to use to determine in this case whether it applies? Is it the quantum of permanent injury? Is it the fact that they didn't charge it as assault on an LEO? What's the test? Well, I mean, I think that, in my opinion, it goes, I think it goes to the injury. I think, you know, if it… The quantum of the injury. I agree. And where does it start? Well, certainly, as this Court talked about, 25%. That's what one case… Is what the case is. But what about in between those? Do we take it on a case-by-case basis? Well, I would. I would, sure. As an appeals judge as opposed to a trial judge? I think a case-by-case, you know, coming as a trial lawyer that I am, a case-by-case, you've got 3%. But there, if the law is it applies, but based upon the discretion of the trial court, then you've got a very, you know, it's abuse of discretion standard. We'd have to defer to Judge Haddon. But I think, in this case, the law was misapplied because of… I mean, it's not simply just one or the other. I think it's 3%. With respect, counsel, I think you're confusing the issues here. Either the law doesn't apply because there's double counting and we apply the rule of lenity, or it applies and you're talking about a quantum. In that case, we have to defer, do we not, to the trial judge on an abuse of discretion standard. Which is it? Which is it? You be the judge. Which is it? Before you answer, let me ask you, maybe I thought there were two different standards, permanent and life-threatening, as opposed to serious bodily injury, and that he got permanent or life-threatening. He got, yeah. I mean, the probation, everyone was stuck on the word permanent because of the 3%. No, but wait, aren't those two different enhancements? Permanent or life-threatening bodily injury is one, and the other is serious bodily injury. And did he get permanent or life-threatening? He got permanent and life-threatening. He didn't get serious bodily injury. But that's one of the elements for the aggravated assault. That part's a little confusing. But he also got permanent or life-threatening enhancement. Yes, yes, because the probation officer was stuck on the permanency of the 3%. What are we on the earlier question? Yes, I'm trying to think about that as I'm answering Judge Reinhart's question. You know, to be in all candor, and I've been in front of, you know, well, in all candor, there has to be an issue of the percentage. So, then, in effect, what we are left with from your perspective and your client's perspective is we're going to review what Judge Haddon did based on an abusive discretion standard. Is that correct? Yes, and within the record, there's a conflict between the first doctor who said that there's no rateable injury and the second doctor, who's a workman's comp doctor, who said it was 3%. And an abusive discretion standard, what do we have to find to overturn what Judge Haddon did? What's the rule? Well, you have to find an abusive discretion. How does that get quantified here? That's for the court to decide. I would leave it to the… Thank you for that very helpful… Okay. Thank you very much. Thank you, Judge.
judges: Schroeder, Reinhardt, Smith